1  ROB BONTA
   Attorney General of California
2  SARAH E. MORRISON, State Bar No. 143459
   Supervising Deputy Attorney General
3  DONALD ROBINSON, State Bar No. 72402
   KATE M. HAMMOND, State Bar No. 293433
4  Deputy Attorneys General
     300 South Spring Street, Suite 1702
5    Los Angeles, CA  90013-1230
     Telephone:  (213) 269-6531
6    Fax:  (916) 731-2128
     E-mail:  Kate.Hammond@doj.ca.gov
7
   *Attorneys for Plaintiffs*
8  *California Department of Toxic Substances*
   *Control and the Toxic Substances Control*
9  *Account*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL and the TOXIC SUBSTANCES CONTROL ACCOUNT, <br><br> Plaintiffs, <br><br> v. <br><br> EXXON MOBIL CORPORATION, et al., <br><br> Defendants. | Case No.: 2:21-cv-01739-DJC-JDP <br><br> **PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR APPROVAL AND ENTRY OF CONSENT DECREE** <br><br> Trial Date:  None Set <br> Action Filed: September 24, 2021 |

Plaintiffs the Department of Toxic Substances Control ("DTSC") and the Toxic Substances Control Account (collectively, "Plaintiffs") respectfully submit this supplemental brief in support of their Motion for Approval and Entry of Consent Decree (ECF No. 91) in response to the Court's Order requesting a more detailed explanation of the financial commitment and financial risks the Participating Parties would be assuming and the estimated amount the Participating Parties would pay into the Qualified Settlement Fund before it becomes self-sustaining (ECF No. 93).

## I.  THE PARTICIPATING PARTIES' FINANCIAL COMMITMENT AND RISKS

The Proposed Consent Decree imposes substantial financial commitments and financial risks on the Participating Parties.

The Participating Parties must make initial payments of $2,000,000 into the Qualified Settlement Fund and $232,449.71 to DTSC to reimburse DTSC for a portion of its past response costs.[1] (ECF No. 85-1 ["CD"], § VI.24.F, p. 14[2], § VI.24.I.1, p. 16.)

In addition to this initial $2,232,449.71 payment, for the duration of the Proposed Consent Decree, the Participating Parties must ensure complete payment for:

   a) All work required to be done at the Facility pursuant to the Facility permit, a 2004 Consent Order between DTSC and the operator, and applicable regulations and statutory requirements for post-closure and/or corrective action, as each is amended over time. This responsibility includes anticipated routine and non-routine work (e.g., maintenance and repairs, anticipated infrastructure replacement, and ongoing monitoring), and work arising from less-anticipated events (e.g., responding to new releases of contaminants, implementing new corrective action, and repairs arising from acts of nature, such as wildfires, floods, and erosion);

---

[1] Plaintiffs are mindful of the burdens imposed on the Court and parties in connection with lengthy briefing and only repeat information contained in their moving parties in this briefing as necessary for context.
[2] Citations to page numbers in the Proposed Consent Decree are to the ECF file-stamped page number at the top of each page.

b) All administrative activities associated with Facility operations (e.g., insurance, reporting, and payment of utilities and taxes);

c) Statutory permit fees, including permit processing and modification cost reimbursement and the annual facility fee, which is presently $48,550 per year (*see, e.g.*, Cal. Health & Saf. Code §§ 25205.2(d), 25205.7);

d) The demonstration of financial assurance[3]—separate from the amounts deposited in the Qualified Settlement Fund—in the amount of $26,383,262 (and any subsequent amounts as required by statute and regulations);

e) Costs arising from the administration of the Qualified Settlement Fund and Non-Qualified Settlement Fund;

f) Any taxes on the Qualified Settlement Fund or Non-Qualified Settlement Fund; and

g) DTSC's unreimbursed, recoverable future response costs. (*See, e.g.*, CD, § VI.24, pp. 12-17.)

To ensure payment for the foregoing costs, the Proposed Consent Decree imposes a series of contingent payment obligations on the Participating Parties. As explained below, when and whether these payment obligations are triggered generally depends on the type of cost at issue, whether the cost is paid from money considered "principal" or money not considered principal within the Qualified Settlement Fund, and/or the amount of money available outside principal.

Pursuant to the Proposed Consent Decree, the Qualified Settlement Fund will have amounts of money considered "principal" and not considered "principal."

---

[3] Statutes and regulations require owners and operators of hazardous waste facilities to maintain financial resources to adequately pay for estimates of at least thirty years of certain costs, including costs for post-closure and corrective action at the facilities required under the California Hazardous Waste Control Law, California Health and Safety Code section 25100 et seq. *See, e.g.*, Cal. Code Regs. tit. 22, §§ 66264.144, 66264.145. To satisfy this requirement, owners and operators must demonstrate "financial assurance" to DTSC using financial mechanisms as specified in the applicable regulations (e.g., trust funds, surety bonds, and insurance). *Id.* § 66264.145. Costs to obtain these mechanisms may vary depending on a variety of factors, including the type of mechanism, market factors, and risk assessments.

Principal, which will include the Participating Parties' $2,000,000 contribution and $82,881,027 of the contribution from the Cashout Parties, will be available to pay for "contingencies," only. (CD, App. B, ¶ 6, p. 169, ¶ 18, p. 177, App. A-3, p. 163.) Contingencies, as defined in the Proposed Consent Decree, generally include costs arising from non-routine, less-anticipated events, such as natural disasters and releases of new contaminants. (*Id.*, App. B, ¶ 13, pp. 172-173.)

Money held in the Qualified Settlement fund that is not principal, including $20,000,000 of the contribution from the Cashout Parties and any net return on investment from the Qualified Settlement Fund,[4] will be available to pay for Facility "expenses." (*Id.*, App. B, ¶ 7, pp. 169-170, ¶ 15, p. 174.) Expenses, as defined in the Proposed Consent Decree, generally include all anticipated routine costs to be incurred by the Facility, such as costs associated with routine operations, repair, and maintenance, administrative costs, statutory permit fees, and costs to provide financial assurances, and anticipated, non-routine costs, such as infrastructure replacement after life-span expiration. (*Id.*, App. B, ¶ 13, pp. 172-173.)

If Facility expenses for any year are greater than money available outside principal, the Participating Parties must pay the shortfall as needed each year. (*Id.*, § VI.24.G.1, p. 15, App. B, ¶ 16.A, p. 175.) The Proposed Consent Decree also obligates the Participating Parties to ensure payment for contingencies at the Facility. (*Id.*, § VI.24.G.2, p. 15, App. B, ¶ 16.B, p. 175.) And if principal money within the settlement fund is used to pay for contingencies at the Facility, Participating Parties must re-pay the full amount of principal used amount back into the settlement fund. (*Id.*) Participating Parties can elect to use money outside principal to pay for contingencies, but then less money will be available outside principal to pay for Facility expenses thereby increasing the Participating Parties' potential annual shortfall payment obligation. (*See id.*, App. B.,

---

[4] Any return on investment must first be used to adjust the principal amount to account for inflation or deflation each year. (CD, App. B, ¶ 9, pp. 170-171.) Any remaining return on investment will be available to pay for Facility costs. (*Id.*, App. B, ¶ 15, p. 174.)

1  ¶ 15, p. 174.)

2      The Participating Parties' payment obligations under the Proposed Consent Decree could be substantial in any particular year. For purposes of the settlement, DTSC estimated that anticipated routine and non-routine work at the Facility could cost $151,676,518 over the next 500 years assuming a 0.75% discount rate. (ECF No. 91-1, Gaspari Decl. ¶ 15.) Settling Defendants reviewed this estimate, and the parties used this estimate in the Proposed Consent Decree. (Supp. Decl. of M. Gaspari ["Supp. Gaspari Decl."] ¶ 2.) This estimate is based on a review of average costs incurred at the Facility for post-closure operations over two decades and includes anticipated, non-routine costs, such as major equipment replacement. (Gaspari Decl. ¶ 15.) As discussed in more detail below, this estimate does not, and could not, include all potential costs that may be incurred in connection with the Facility. (Supp. Gaspari Decl. ¶ 3.)

    Assuming a 0.75% average real return rate (i.e., return net of inflation and fees) on the money held in the Qualified Settlement Fund would result in $799,014[5] in returns in the first year, and smaller amounts in future years as the available money outside principal is depleted to pay for Facility costs. Using annual cost estimates from the 500-year settlement cost estimate, there would be an annual shortfall between the estimated return on investment ($799,014) and Facility costs ($1,181,817) of $382,803, which Participating Parties would need to pay as the available money outside of principal is depleted. (*See* Supp. Gaspari Decl. ¶ 2.) In early years, this figure would be lower and in later years it would be higher, but the average over the 500-year period would be $382,803 per year in 2023 dollars.

    The Participating Parties' estimated $382,803 shortfall payment constitutes approximately 32% of the estimated $1,181,817 annual Facility costs. This is roughly

---

[5] This assumes the settlement fund in the first year will hold the $102,881,027 Cashout Party contribution, the $2,000,000 Participating Party contribution, and for simplicity, $1,654,203 from remaining insurance, which will not be held in the settlement fund, but will be available for Facility costs until depleted. (*See* CD, App. B, ¶ 11, p. 171.) The total of these figures equals $106,535,230 and multiplied by 0.75% equals $799,014.

5

correlated to the Participating Parties' collective 36.96% contribution of the total tonnage disposed of at the Facility. (ECF No. 91-1, Gaspari Decl. ¶ 20.) And because the Participating Parties assume all risk to ensure payment for any and all Facility costs for the duration of the consent decree, even if those costs are greater than the settlement cost estimate or arise from events the parties did not include in that estimate, the Participating Parties' payment obligation could be significantly higher in any given year.

Notably, the settlement cost estimate does not include all costs that would be "expenses" under the Proposed Consent Decree. These include (a) costs to acquire financial assurance mechanisms (which could be hundreds of thousands of dollars or more),[6] (b) earthquake repairs greater than $3,000,000, (c) costs to administer the Qualified Settlement Fund, and (d) any future response costs recoverable by DTSC under the Proposed Consent Decree, which could be considerable if DTSC must enforce the consent decree or initiate a work takeover. (Supp. Gaspari Decl. ¶ 3; CD, App. B, ¶ 13, pp. 172-173.) For example, DTSC's past enforcement costs in connection with this Facility and this present dispute were at least $788,000. (Supp. Gaspari Decl. ¶ 4.) Participating Parties bear the risk that annual expenses at the Facility will be greater than available settlement funds each year.

The settlement cost estimate also does not include costs that would be considered "contingencies" under the Proposed Consent Decree. (Supp. Gaspari Decl. ¶ 3.) These costs could be substantial because contingencies include costs that arise from events such as natural disasters and new releases of contaminants. (CD, App. B, ¶ 13, pp. 172-173.) As an example, if an earthquake requires repairs costing $3,000,000 or more at the Facility, the Proposed Consent Decree requires the Participating Parties to ensure funding is available to pay any and all amounts greater than $3,000,000. Similarly, if a wildfire destroys the groundwater monitoring system, a rainstorm damages

---

[6] For example, the cost to obtain a surety bond may require the payment of a premium calculated as a percentage of the bonded financial assurance amount, $26,383,262 (CD, App. D, p. 185). Even assuming a relatively low premium rate (e.g., 1%), the premium could be around $263,000.

the landfill cover, or a new release requires removal activities and the creation of a new containment system, the Proposed Consent Decree requires the Participating Parties to ensure payment for all of this work. And if, for example, $5,000,000 of principal from the Qualified Settlement Fund is used to pay for these costs, Participating Parties must pay $5,000,000 to replenish the Qualified Settlement Fund.

Finally, the settlement cost estimate also does not consider the Participating Parties' obligation to pay an additional $175,141.29 of DTSC's past response costs. (*See* CD, § VI.24.I.2, p. 16; ECF No. 91-6, Hammond Decl. ¶ 7.) If there is insufficient money outside principal within the settlement fund to pay this amount when it is due—two years after the consent decree effective date—the Participating Parties must pay any shortfall. (CD, § VI.24.I.2, p. 16.)

Accordingly, the Participating Parties' payment obligation could be substantially higher than the figure derived from the settlement cost estimate in any given year during the duration of the consent decree.

The Participating Parties could potentially reduce their payment obligations by pursuing more aggressive investment positions with the Qualified Settlement Fund, which could potentially generate greater returns on investment. This approach, however, carries risk for the Participating Parties. If those more risky, aggressive investment positions perform poorly, there will be less money available to pay for Facility expenses and the Participating Parties' shortfall obligations will increase. Similarly, there will be less money outside principal available to pay for contingencies, which increases the risk that principal will be used to pay for contingencies and Participating Parties will need to replenish any principal used back into the Qualified Settlement Fund. The Proposed Consent Decree also obligates the Participating Parties to make payments into the Qualified Settlement Fund if the investment performance of the settlement fund decreases the value of the principal. (CD, § VI.24.G.3, p. 15, App. B, ¶ 16.D, p. 175.)

As outlined above and in prior filings, the Participating Parties will be jointly and severally liable for all financial shortfalls if available money in the Qualified Settlement

Fund is not sufficient to pay for required Facility work. This commitment is of tremendous value to the public and Plaintiffs, and it makes this settlement more favorable than many other settlements in similar litigation. Other settlements often include limitations on work obligations beyond a particular selected remedy and require further negotiation or litigation if that remedy fails to accomplish its purpose or fully and finally address environmental conditions and threats at the facility. While here, Participating Parties are obligated to provide funding for any future required work (e.g., all post-closure and existing and new corrective action, under current statutes or regulations, and as those statutes and regulations are amended over time), even if that work requires the implementation of a new remedy that is not currently in operation at the Facility. For example, if a new release or new contaminant is discovered at the Facility that triggers a need for new corrective action, Participating Parties are obligated to ensure funding for this new corrective action. Additionally, the Participating Parties' joint and several liability under the Proposed Consent Decree further protects the public and Plaintiffs and ensures funding remains available for the Facility even if an individual Participating Party fails to satisfy its obligations. (*See* CD, § VI.24.A, p. 13.)

## II.     SELF-SUSTAINING SETTLEMENT FUND

A primary goal of the Proposed Consent Decree is to ensure complete funding is available—without burdening California taxpayers—to pay for all Facility operations over the entire time those operations are necessary to protect public health and welfare and the environment. (CD, § V, p. 12.) Accordingly, the Proposed Consent Decree grants DTSC the discretion to determine if the Qualified Settlement Fund is "self-sustaining" sufficient to warrant terminating the Proposed Consent Decree and relieving the Participating Parties of their obligations to pay for Facility contingencies and expenses. (*Id.*, § XI, p. 22, § XXVIII, p. 38.)

DTSC presently anticipates that Facility operations will be necessary indefinitely. While DTSC has estimated the potential cost of those operations for many years into the future, for the reasons discussed above, that estimate may differ substantially from real-

world conditions. DTSC also has not yet been able to evaluate the performance of the Qualified Settlement Fund, which will be established if the Proposed Consent Decree is approved. All of these variables make it very difficult for DTSC to ascertain when the Qualified Settlement Fund may be self-sustaining and to provide an estimate of the amount Participating Parties would pay into the Qualified Settlement Fund before it becomes self-sustaining.

As time progresses, DTSC will continue to evaluate these variables and will assess any request to evaluate whether the Qualified Settlement Fund is self-sustaining consistent with its obligations under the Proposed Consent Decree and applicable law.

Even though DTSC cannot provide this estimate, DTSC notes that it anticipates that it will be many years—if ever—before the Qualified Settlement Fund is self-sustaining and that Participating Parties may have significant payment obligations during the duration of the Proposed Consent Decree, as discussed above.

More specifically, if DTSC determines that the Qualified Settlement Fund is self-sustaining and the consent decree terminates, DTSC anticipates that the remaining money in the Qualified Settlement Fund would be considered state money. The money would then be subject to the various requirements imposed on state money, including the prohibition on investment in corporate stock.[7] *See, e.g.*, Cal. Gov't Code § 16305.2; Cal. Const. art. XVI, § 17.

Accordingly, to determine whether the Qualified Settlement Fund is self-sustaining DTSC likely would consider the performance of the fund if invested as state money. Because of investment requirements, the performance of the settlement fund as state money may result in relatively low or negative real annual returns. For example, the California Pooled Money Investment Account, when considering inflation rates, has on average over the last twenty years experienced negative annual returns.[8] Therefore, the

---

[7] DTSC acknowledges that laws may change in the future, which may permit a different classification and/or treatment of this money. For now, DTSC assumes the money would be state money and would be subject to presently applicable restrictions.
[8] *See* Cal. State Treasurer, *Pooled Money Investment Account*, *Average Annual*

Qualified Settlement Fund would need to grow significantly over many, many years before it could be considered self-sustaining. And until that Qualified Settlement Fund is self-sustaining, if ever, the Participating Parties must continue to satisfy their payment obligations under the Proposed Consent Decree.

DTSC also notes that after the parties had extensively negotiated the terms of the settlement and investigated the potential liability in connection with the Facility over the course of many years, with the involvement of sophisticated common joint defense counsel and other outside counsel, Settling Defendants chose whether to settle as a Participating Party or Cashout Party. (Supp. Decl. of K. Hammond ¶ 2.) The parties were free to weigh, on one hand, the immediate financial burden associated with cashing out and paying a premium for liability finality, and, on the other, the financial burdens and risks associated with settling as a Participating Party and incurring open-ended risk to pay known and unknown Facility costs for a substantial amount of time. Certain Settling Defendants elected to cashout and others elected to take on the responsibilities of the Participating Parties. This process provides further strong indicia that the settlement is substantively fair. *See United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 87, n.4 (1st Cir. 1990); *City of Bangor v. Citizens Commc'ns Co.*, 532 F.3d 70, 98 (1st Cir. 2008).

Moreover, the fact that the Settling Defendants (both Participating Parties and Cashout Parties) are collectively committing to be responsible for 100% of required Facility costs—including known and unknown costs—when they collectively contributed less than 100% (i.e., 71.53%) of the total tonnage sent to the Facility (ECF No. 91-1, Gaspari Decl. ¶ 20) further demonstrates substantive fairness, particularly as between the Settling Defendants and any non-settling parties. *See City of Bangor*, 532 F.3d at 98.

Plaintiffs respectfully request that the Court enter and approve the Proposed Consent Decree.

---

*Yields*, https://www.treasurer.ca.gov/pmia-laif/historical/annual.asp; US Inflation Calculator, *Current US Inflation Rates: 2000-2023*, https://www.usinflationcalculator.com/inflation/current-inflation-rates/.

| | | |
|---|---|---|
| 1 | Dated:  January 11, 2024 | Respectfully submitted, |
| 2 | | ROB BONTA<br>Attorney General of California |
| 3 | | SARAH E. MORRISON<br>Supervising Deputy Attorney General |
| 4 | | |
| 5 | | */s/ Kate M. Hammond* |
| 6 | | KATE M. HAMMOND<br>DONALD ROBINSON<br>Deputy Attorneys General |
| 7 | | |
| 8 | | *Attorneys for Plaintiffs*<br>*California Department of Toxic* |
| 9 | | *Substances Control and the Toxic*<br>*Substances Control Account* |